May it please the Court, my name is Margo Piskovic and I represent Mr. and Mrs. Van Asdale. And I would like to reserve about three or four minutes for a reply. Watch your own time, but I'll try to help you out. I will. Thank you. We're here because of the memorandum decision and order entered by Judge McQuaid, for whom I have a great deal of respect. But what he found was the meeting between Mr. and Mrs. Van Asdale and Mr. Johnson on November 24th did not constitute protected activity and that Sox says that you must incriminate or accuse and not implicate. And then he relies on the Bozeman case. It is our contention that there is sufficient evidence for a reasonable jury to return a verdict in favor of the Van Asdales. And regardless of what case law you want to use, and there's not a lot interpreting Sox. Do you agree that your case either rises or falls on the conversation between your client and Mr. Johnson? Oh, I think that's a very key point. But you have to put it in context and the circumstances as indicated by all of the cases. Is that a yes or a no? Yes. It does rise on that. And the circumstances and the conversations are we have a merger of $1.4 billion. Yeah. I understand. I just want your position. Yes, it does. So if we focus on Johnson, the Johnson interview, that's really the guts of this appeal. Well, you have to put it in the circumstances. Let Judge Wallace finish his line of questioning. I know you want to answer or talk about that, but let him finish. Because as I understand it, this is the only conversation which is close enough to give you the inference you'd like to draw as to timeliness. And the question I want to ask you to focus on is the affidavit that he files afterwards. The judge below decided that that could not be used to change, as he saw, the deposition. It seems to me that the case that's where the case is right there. Why was the judge wrong? Oh, for several reasons. First of all, you have to look. The judge found that Mr. Van Asdale and Mrs. Van Asdale had a subjective belief that there had been a problem. They also, he said that you need a reasonable, objective belief. Okay, with or without the affidavit, it doesn't matter. You have the intentional nondisclosure of the Australian flyer, which in essence voids the patent. And even Mr. Johnson indicates in his deposition testimony that on page 446 of the record, maybe he came right out and said, I can't recall, that Mark had hidden that e-mail or hidden that information from him. The problem is, is that the Australian flyer voids the patent, or can void the patent, and in actuality did. Valley's won the litigation. He indicated that there was a potential for fraud. When you have a merger of $1.4 billion with one asset primarily being purchased, i.e., a patent, merger and fraud go together. When he says we have a problem here, there's a potential for fraud, then they said to him, well, in the deposition, what other statements did you make? He said, well, there might be a potential for fraud on the patent office with the triple zero patent. And Mr. Hettinger claims he never saw that information, but even Mr. Johnson said he found hard to believe. The affidavit of the ---- The problem is with your case is that if the judge was right, that at the time of the Johnson meeting, he only talked about the fraud on the patent office, if the judge is right, then you have a real problem with your case. What is the ---- what's the standard of view that we place upon that decision of the trial judge that that was, in fact, he was talking about fraud on the patent office? Well, I believe, Your Honor, that there are material facts that exist to show that that's not all that happened. And so if there's evidence for a reasonable jury to return a verdict in favor of the on a motion for summary judgment. And what we're talking about is the topolitary of the circumstances. He already wanted an investigation. He went to Mr. Johnson to say this is what happened. This is why I went back to Chicago on the 12th, the day this patent was supposed to issue. All of a sudden, out of magic, comes this Australian flyer, and it is determined that it stops the triple zero patent. Yeah. I understand that. I read your brief. But that wasn't my question. My question was, what is the standard of review of the decision the judge made when the judge decided that you could not add anything to the affidavit, and the affidavit spoke of fraud on the patent office? Oh, you mean on the affidavit, not the facts? On the decision by the judge. If the decision on the judge's, is there any material facts? And the material facts ---- I think we're trying to confine the universe of what we're considering in terms of facts, and the question, the related question is, can we consider the affidavit? The district court said no. The district court said it was a sham. We don't believe it is a sham. Did the district court actually conclude that it was a sham, or did it just cite the sham case? It cited the sham case. In fact, the district court actually said that the comment that Mr. Johnson seemed to understand what was being said could be, was not changing it. In my opinion, he was, we have two very good, smart lawyers. Mr. Van Asgale is a very bright lawyer with a nuclear engineering degree and background in design patents, and we have the plaintiff's set of, the respondent's team who are very good, and they're sparring with each other. And they never asked Mr. Van Asgale, did you talk about fraud upon the shareholders? But when you have a merger, and you have a $1.4 billion deal that has not been fully disclosed to the board, even Mr. Pennington got it and said, let legal handle this. It could go clear to the top. So Mr. Johnson got it, and he obviously understood the whistleblowing implications because he made the decision on November, the meeting was on the 24th, he made the decision within three days to terminate him. Now, we understand the argument, but just to get back so that we understand in what context, but do you believe that the district court improperly applied the sham affidavit rule? I do. Because there's nothing new or contrary in that affidavit. And the second question is the one that Judge Wallace asked, which is, what's the standard of review of that decision? That's a good question. I never did look that up. I assume it would be an abuse of discretion, if I'm not mistaken, but I honestly don't know the answer. Okay. Anyway, going forward, and when you look at then the decision to terminate, you have to look at what happened. Everything that happened after that is pretextual. The decision to terminate comes within three days. According to Mr. Johnson and Mr. Matthews, they thought that Mr. Van Asgale was basically an argumentative poor employee. They thought that he had botched the I.T. litigation. They had all of that information the day that Sarah Beth Brown left unexpectedly and Mr. Johnson became the judge. It does appear that when there was the takeover, that the company that was taken over ended up sort of substituting many of its employees into the highest position, including the general counsel, Mr. Johnson. Were there other attorneys in the legal department that came from IGT that were also replaced? No, not at that time. Sarah Beth Brown, the chief legal counsel, was replaced very suddenly. How large was this legal department? There was Mr. Van Asgale in the legal department, and there were, I believe, two other attorneys at that time. And then Mr. Van Asgale was subsequently replaced on the evening of January. We're talking legal staff of three or four? That's what I'm thinking. But you don't include Lena in there? No. Mrs. Van Asgale was in the patent prosecution division. She did report, however, to Sarah Beth Brown. But she wasn't in a lawyer position, in an attorney position? She had a law degree but not in an attorney position? She was in an attorney position but not in the little core. In the general counsel's office? In the general counsel's office. But, yes, she's a lawyer and an engineer as well. So you have, when this comes about, you've got the three highest people at anchor who become the three highest people at IGT, the chief executive officer, the chief legal officer, and the strategy and development person, Mr. Hettinger. And when you do the merger, everybody had gone through the information. Everybody knew about the Monte Carlo machine. Everybody. In fact, Sean bought that machine. But it's the Australian flyer that caused the problem. And after IGT received the letter of complaint from Mr. Van Asgale's prior attorney, then they hired Mr. Laxall. And of the 30 or 40 people that he interviewed, not one was asked about the Australian flyer. When they knew about it, what happened, how they interpreted it, they were merged into one item, the vintage slot machine versus the Australian flyer. The Australian flyer was published in 1978 in the United States and does constitute prior art, which is a fraud upon, which could be a fraud upon the patent office and could invalidate the patent, and subsequently in the litigation. And IGT did redesign the patent and came up with a 646 and then did sue IGT. And that case is on appeal up here now because the patent was found to be invalid. So what I'm saying is when you walk in here, Mr. Johnson knew exactly. You're talking to the person who was the head legal officer. You're talking to the person that sat through the merger. You're talking to the person that knows that this was a $1.4 billion deal, that his people made multi-millions on this transaction. And it's a little difficult to go in and say, gee, I think that the CEO has committed fraud. There's a potential for fraud. We need an investigation. We need to find out because this document came up suddenly, surprisingly, and it doesn't pass the smell test. That's what's going on. Mr. Johnson didn't say, gee, Sean, we know about that. We've checked into it and it's fine. He didn't say, gee, Sean, we'll check and see we'll just do an investigation. Let's see what happens. He didn't say, gee, Sean, let's look at the fraud on the patent office. He did nothing but made the decision to terminate. And you don't think he understood the implications of what was being said? That's just too far to stretch. That's a very far stretch. You're within the time that you wanted to reserve. Thank you. Thank you, counsel. Good morning, Your Honors. Richard Campbell on behalf of IGT. To answer Judge Walz's question, that Judge McQuade's ruling on the sham affidavit was an evidentiary ruling at the time of that hearing, and thus it would be an abuse of discretion. It would not be a de novo review, I believe. Second, whether the affidavit is a sham affidavit, isn't that a finding of fact? I think it's a legal finding that when you review the two, the actual discussion. Whether or not an affidavit contains sham is a factual determination. Yes. So I'm just asking the question of the same question I asked counsel, because we always have to know our standard review. That's how we make decisions. People lose very often or win because of standard review. If it is a finding of fact, then the demonstration would have to be that that finding was clearly erroneous, which is a tough burden. Yes, I agree with that. So you conclude it is, and that's what our cases have said, too. It's an abuse of discretion. The Kennedy case identifies it as a finding of fact. So your position is that it's not clearly erroneous, that finding. Correct. Is that subject to a jury determination? I want to follow up on Judge Walz's question. If it's a finding of fact that may be subject to dispute, that is, is there some question as to whether the affidavit actually contradicts the testimony in the deposition? I don't think it's a factual issue. I don't think there's a dispute of fact. I think there was no abuse of discretion by Judge McRae. My guess is that the Van Asdaels will say there's no inconsistency between his deposition testimony and his affidavit. Oh, there's a wide inconsistency. I think Judge McQuaid was very clear in that. It was clear that Judge McQuaid thinks so, and it's clear that you think so. The question is, is that itself a dispute of material fact? I don't think it is, no. And there was no hearing on it. I mean, the judge didn't look at the witness and say, I conclude that you're lying based on your demeanor. He ruled in the summer judgment hearing. Right. So you're taking a document that's equally available to us as to the district court and an affidavit that's, I mean, a deposition and a sham, but the affidavit is equally. So isn't that an application of law to fact subject to de novo review? I don't think so. I think it's more of an evidentiary ruling. No, but it's not a, you know, in a summary judgment, you don't make evidentiary rulings, generally speaking. You're talking about undisputed facts. They're genuine issues of fact that goes to the jury. So if you're saying it's an evidentiary ruling, that in summary judgment shouts out to me, disputed issue of fact resolved by the trial court properly or improperly, but not subject to summary judgment. So you can see, you know, there are different ways of looking at it. That's why it's sort of an interesting question. But it may be pivotal in this case. Yeah. Well, it is a pivotal issue because it really, the reason that this affidavit was submitted, because what was said in the sworn deposition testimony does not carry the burden, and that the affidavit was submitted after the depositions and after the summary judgment motion was filed. Right. The question is, does it contradict the sworn testimony? And I guess we just have to make up our own mind on that. It clearly contradicts. And I would point the Court back to, and I think this is a very, probably the pivotal issue, and Judge Wallace picked up on it. That conversation that took place on the, I believe it was either the 23rd or 24th of November, was the conversation that, you know, Ms. Piskovic just admitted that whether or not the whistleblowing took place. And you have to look at that conversation in context. There were, not only was the, the transcript is very clear, and I would urge the judges here to not look at the spin or the hyperbole or exaggeration of what was meant by that conversation, but to look at the actual transcript of that conversation. Not only that conversation, there was an additional conversation that we cited in the record. That same day after the meeting with the three of them, Mr. Johnson met Mr. Van Asdale in the hallway, and once again he said we need to talk about that investigation into the That's not inconsistent with the idea that there was also something else behind it. The fact that he said I have two concerns, and he finds him later in the hall and says I have a concern about issue number one doesn't mean that he didn't raise number two. Look at the transcript, though. He never said there was two concerns. It was very clear. They were very definite and specific as to what that conversation was entailed in that meeting. It entailed inequitable conduct, fraud on the patent office. Just because the use of the word fraud doesn't mean that it was a general fraud. Fraud on the patent office, inequitable conduct, is a legal term of art among IP attorneys. They have two IP attorneys in this room. You have Mr. Johnson, who is a general counsel of a company with a lot of IP. The context, the clear context, and there's no other interpretation, I think, and there's no second meaning or additional meaning in that conversation, was regarding the inequitable conduct. How do we defend this case against Valleys? There was a nondisclosure of a document, so we have to make sure that we don't get hit with an inequitable conduct charge. As a precursor to that, I just want to point out, too, there's an e-mail that was read by Mr. Johnson in his deposition, and that e-mail is somewhat mischaracterized in the brief, but if you look at the actual e-mail itself, it talks about Sean sending an e-mail to Mr. Johnson saying we have to talk about the CIP miscue related to the patent litigation. That is the context for going into that meeting that same day, is to talk about how do we deal with this Valley litigation issue. It's hard to have you both of you have used the term context a lot. I think we've probably used it, but at this stage, don't we draw on the inferences if there are to be drawn in favor of the plaintiff? And you can be susceptible to two different interpretations, I think, but aren't we required to draw the inferences in favor of the plaintiffs here? And I think that's exactly what Judge McQuaid did. He drew all the inferences in favor of the plaintiff, and he found, and his decision is very clear, that that inference, even in favor of the plaintiffs, is with the actual language of the deposition testimony, what took place in that meeting. The entire meeting centered solely around the issue of inequitable conduct, fraud on the patent office. How do we deal with that in our litigation strategy with Valleys, which was a very important piece of litigation? So I think the context was very clear in that case, in that meeting. There was no second meeting. There was no in addition to. Mr. Van Asdael was asked exhaustively, I believe, what transpired in that meeting. And if you look at his wife's deposition transcript, who his wife was deposed several months before, and Mr. Van Asdael was there and heard what transpired in her deposition, she clearly says that the entire scope of that meeting was related to inequitable conduct, fraud on the patent office. The appellants would like you to believe that there is somehow this nebulous cloud floating around, that there was context for this fraud or, you know, shareholder fraud out there floating around, that Mr. Johnson should have somehow tapped into that collective consciousness. But it just isn't there. You can't just say that just because the word merger was mentioned, merger was mentioned because it was contextual as to time when this document wasn't produced. So I just don't think you can make that leap, that just because they said fraud on the patent office, that somehow infers that there was a second meeting. That's like saying if an attorney says, well, there's a statute of fraud issue here in this case. Does that mean that there's some kind of fraudulent activity that would implicate some other crime involving fraud? No, it's a term of art, and everybody in that room understands that term of art of fraud on the patent office, inequitable conduct. It could impact some litigation when you assert that patent in that litigation. So, again, I think Judge McCoy got it definitely right. He looked at that. I think he gave the benefit of the doubt to the plaintiffs, and I think he was clear that what they did in the affidavit was try to reinvent what really transpired in that meeting, and it was a direct contravention. It was not to explain or to clarify what wasn't asked. It was to add to because they realized when they saw that motion for summary judgment and the deposition testimony that they had not been definitive and specific as the law requires. Who conducted the deposition with Sean? Excuse me? Who conducted the deposition with Sean? Mr. Krischer took his deposition. I took Ms. Van Asdale's deposition. And they were both present at the deposition, each other. So, clearly, and if you look at that and then apply the law here, and I'd like to alert the Court we did find one other additional First Circuit decision that applied the specific and definitive, and that was the Davey-Staples 555S, the third, 42. You can give the citation to the clerk afterwards and she'll distribute it. But it's an example of another circuit following it. You have to be definitive and specific, and that's the real crux of the case here. You can't infer. You can't beat around the bush. You know, you can't come up with general statements. I mean, you have to refer to specifically in a fashion with some specific facts that here we think there was some shareholder fraud here. And saying that fraud on the patent office equates to shareholder fraud is just a giant leap here. Mr. Johnson, you know, there's no testimony that he ever understood that. Although, you have to say that it's pretty coincidental that Sean gets fired three days after he raises the possibility of fraud on the patent office. I don't think it's coincidental at all. One, he wasn't fired. I think that's a misrepresentation in the record. He was Mr. Johnson's testimony, and the record is clear, that he decided that he didn't want Sean in the legal department anymore, that he was going to find another place for him within the legal department. He said he hoped he would find a home for himself. Well, his current position was over. That was clear. He wasn't going to be in the legal department. He was not going to be in the legal department. If you buy their argument that it was pretextual and we wanted to get rid of this guy because he had blown the whistle on some horrible thing involving management of the company, why leave him at the company for a period of three or four months if it's pretextual? Their explanation is they had cancer. So it seems to be sort of a humanitarian stay. No, no. The cancer was later on, and his wife was also in the meeting. There was never an intent to terminate her until after Sean was terminated. So why leave these two people in the company if you're really afraid of them blowing the whistle and turning over the stones on this horrible issue that they say they communicated? It makes no sense at all. You would walk that person out the door that day, and that didn't happen. Although Johnson's view of Sean does seem to be quite contrary to Brown's view of Sean. It does, and the record was clear that Mr. Johnson did some due diligence on him in that early November time frame and made the decision at the end of November. So, you know, he clearly had some issues with him, and that's not unusual for two different bosses to have two different views of an employee. So I don't think it was pretextual at all. I mean, God would have walked him out the building that day if he was really concerned about him blowing the whistle. He didn't do anything because he didn't know. He was not alerted as to any shareholder fraud. If you look at the e-mail, Mr. Johnson was very clear in questions from Mr. Lynn that when he saw that patent miscue e-mail, he said, we have to clear up this issue as it related to Valley's litigation. The brief says that that e-mail talked about the value and the merger, but if you look at the text of that e-mail, it doesn't say anything about value, doesn't say anything about merger, doesn't say anything about shareholder fraud. It says it talks about a patent miscue and related to litigation with Valley's. So I don't think the record is there. So any way you cut it, I think that Judge McQuaid got it right. He saw what was said in that meeting, and he focused on that. And he looked at the affidavit and he said, you know, all they're trying to do is create an issue of fact, and that's why we can't consider that affidavit. Just in summary, too, if you look at Judge McQuaid's, he did address that sham affidavit in detail and compared it to the side-by-side comparison of the deposition testimony and what was in that affidavit, and I think that finding was right. Remember, there were three people in that room. We have sworn testimony regarding what transpired in that meeting, and all three of those people said nearly the identical same thing, that this related to fraud on the patent office, a term of art in the IP litigation strategy. And there was no words in there, contrary to what the appellants are arguing here, that there was a second meaning or that there was a second issue. All of them defined what was the meeting. The questions were, what was the meeting about? What are you talking about? Fraud. Fraud on the patent office. Inequitable conduct. Mr. Van Assel admitted that that was the same thing, essentially, and that was definitive and specific. If you apply that standard and look at what they said in that meeting and apply that standard to the definitive and specific standard that the other circuits have adopted since the adoption of SOX, you can see that they did not meet that burden. They did not in any way, shape, or form tell Mr. Johnson what he needed to know to understand that they were talking about a Sarbanes-Oxley violation. Thank you, counsel. Your rebuttal. Thank you, Your Honor. Basically, the testimony in the deposition is that Mr. Van Assel said that there was a potential for fraud. He said, what did you tell him? That at least it appears suspicious and there is a potential for fraud. And what other statements do you individually recall saying to Mr. Johnson in this meeting? I told him we need to investigate. We're not talking about a fraud on the patent office. We're talking about a fraud during the merger. You can't talk about this without knowing that there was a problem in the merger. A very key piece of evidence was not disclosed. The affidavit is not a sham. It is additional information, and it's not contrary information. There is no contrary information in it. And also, the Court relied on the Belgrave case, and it doesn't even talk about  the Belgrave case. In fact, the Belgrave case talks about, SOC says implicate. It doesn't say incriminate or accuse. And that's where we're losing the distinction here. Why did they leave him in the company for another two or three months? Because just like they have four lawyers here and they can pay him $750 an hour, they knew the Collins case. They knew they couldn't let him go. It wasn't just even humanitarian. They literally let it stay. And he did have cancer. And you know what? They were going to fire Lena once they fired Sean. Her termination was absolutely bogus. They said that she got into confidential information. She was the patent prosecution officer. She's an engineer by training. She's supposed to know how all of the games work, including Class II games. She was going to go regardless once they made the decision to let Sean go. So there's a whole lot of factual questions here. And I do believe that the Court is incorrect when he granted the summary judgment because there are material facts. There are reasonable minds can differ. Obviously, we have reasonable minds differing on this issue right now. And the employees believed that the conduct of hiding and misrepresenting and hiding the Australian flyer constituted a violation. And a reasonable person in the same position would believe that conduct. And if they do, then that constitutes the violation. And Mr. Johnson got it. He made the decision to terminate. He made the decision immediately within three days. He had the same information before if he wanted to terminate Mr. Van Asdale. He had that all when he came on because he talked to Mr. Matthews, he talked to his competitors, he talked to his rivals, he talked to everybody. And he also knew that the intellectual property case, the case that they were going to file against Bally's had been postponed because of the decision that was made by Kirkland and Ellis that the Australian flyer constitutes prior art, which invalidated the triple zero patent, and they redid the patent. So what I'm saying is the affidavit, with or without it, there's still sufficient information. And the affidavit is not a sham, and it does not contradict any prior testimony. Thank you for your time. Thank you, counsel. The case history will be submitted for decision. Thank you all for your arguments. We'll go to the next case of the oral argument calendar, which is A.L.P.
judges: Wallace, Thomas, Bybee